Original
No. 2008-118

PETITION OF GRETCHEN PARKER
(New Hampshire Department of Health and Human Services)

Argued: November 12, 2008
Opinion Issued: April 8, 2009

*Disabilities Rights Center, Inc.*, of Concord (*Amy B. Messer* and *Adrienne Mallinson* on the brief, and *Ms. Messer* orally), for the petitioner.

*John D. MacIntosh*, of Concord, by brief and orally, for the respondent.

*Kelly A. Ayotte,* attorney general (*Rebecca L. Woodard,* attorney, on the brief and orally), for the New Hampshire Department of Health and Human Services, as *amicus curiae.*

*New Hampshire Legal Assistance,* of Claremont (*Bennett B. Mortell* and *Jonathan P. Baird* on the brief), for *Donna Greenwood,* as *amicus curiae.*

BRODERICK, C.J. The petitioner, Gretchen Parker, filed a petition for writ of certiorari, *see* SUP. CT. R. 11, challenging the decision of the Administrative Appeals Unit of the New Hampshire Department of Health and Human Services that affirmed the cancellation of the residential services contract providing for her care at the home of Jennifer Cavalli. The Administrative Appeals Unit (AAU) determined that the evidence supported the decision of the respondent, the Area Agency of Greater Nashua (Area Agency), that Parker's continued residence at the Cavalli home with the intervenor, Richard Miller, would exceed the "bounds of reasonable risks" under NEW HAMPSHIRE ADMINISTRATIVE RULES, He-M 503.08(c)(4) (effective January 1999) (hereinafter Rule 503.08(c)(4)). We reverse.

I

The following uncontested facts are drawn from the record. Parker is a twenty-eight-year-old woman with developmental disabilities who receives state services funded by the Area Agency. The Area Agency coordinates her services, including providing for her residential placement under a contract with the Institute of Professional Practice (IPP). IPP, in turn, subcontracted with Jennifer Cavalli to provide residential care at her home. Miller is a twenty-four-year-old man with developmental disabilities who has been under legal guardianship for many years. Since 2006 he has received residential services at the Cavalli home under the care of Jennifer Cavalli's husband, Vincent, pursuant to a contract between the Area Agency and Easter Seals.

When Miller moved into the Cavalli home in March 2006, Parker had been living there for about one month. About two months later, she moved to a different residential placement at the request of her guardian. The following month, however, she succeeded in terminating her guardianship and regained her right to make her own decisions. She elected to resume living at the Cavalli home with Miller and in July, the Area Agency approved the services contract for this living arrangement. By all accounts, Parker and Miller are friends and have a healthy sibling-type relationship. Parker, Miller, and Vincent and Jennifer Cavalli have been described as a "family unit," who share a "significant and positive relationship." In addition to residing in the same home, Parker and Miller attended the same day program at Easter Seals in Merrimack.

On October 25, 2006, Miller became frustrated during a group therapy session because of comments made by other participants. Once the therapy session ended, he left the building. Outside, Lea Patnode, the regional director of Easter Seals, observed Miller throwing rocks but "not at anybody or anything" in particular. Patnode attempted to talk to him, but he became angrier and began throwing rocks at the building and at a passing car. He then reentered the building, where he destroyed property and punched at least one staff member. The police and emergency medical technicians were called for assistance. Eventually, he calmed down and went home to the Cavalli home, along with Parker, without further incident. Parker was not harmed, threatened, or involved in the incident.

The Area Agency investigated the incident and determined that Parker's safety could not be assured if she continued to live in the same home as Miller. In November 2006, it notified IPP that it was terminating the residential services contract with Jennifer Cavalli. The Area Agency notified Parker that other residential placements were available for her, but she made it clear that she wished to remain where she was. The Area Agency agreed to an arrangement in which both Parker and Miller would continue to reside at the Cavalli home while alternating overnight accommodations at another location. The Area Agency, however, occasionally permitted them to share the same overnight time at the Cavalli home. The Area Agency's sole basis for terminating the contract with Jennifer Cavalli was the perceived risk posed by Miller living in the same household as Parker. The Area Agency's November 2006 decision was not based upon an evidentiary hearing or adjudicatory process of any kind. Rather, pursuant to its investigation, it concluded that their shared residence would exceed "the bounds of reasonable risks" under Rule 503.08(c)(4).

Parker appealed to the AAU, and, after a hearing, the AAU upheld the Area Agency's decision. Parker's motion for reconsideration was denied. Her petition for writ of certiorari followed.

II

Parker makes three arguments on appeal: (1) the AAU erred by failing to consider all of the evidence before it and failing to conduct a *de novo* review; (2) the Area Agency failed to present sufficient evidence to carry its burden of proof; and (3) the AAU erred by improperly shifting the burden of proof from the Area Agency to her when it ruled that the Area Agency's determination of "reasonable risks" under Rule 503.08(c)(4) controlled. Our certiorari review of Parker's appeal is limited to determining whether the AAU acted illegally with respect to jurisdiction, authority or observance of the law or has engaged in an unsustainable exercise of discretion or has acted arbitrarily or capriciously. *Petition of Kilton*, 156 N.H. 632, 637

(2007); *see also Petition of Moore Ctr. Servs.*, 150 N.H. 177, 178 (2003). Our resolution of Parker's first two arguments negates our need to address her third argument.

This case requires us to interpret both state law and administrative rules, and we use the same principles of construction when interpreting both. *Vector Mktg. Corp. v. N.H. Dep't of Revenue Admin.*, 156 N.H. 781, 783 (2008). "[W]e ascribe the plain and ordinary meanings to words used, looking at the rule or statutory scheme as a whole, and not piecemeal." *Appeal of Morton*, 158 N.H. 76, 78 (2008) (citation omitted). Although we accord deference to an agency's interpretation of its own regulations, that deference is not total. *Vector Mktg. Corp.*, 156 N.H. at 783. We still must examine the agency's interpretation to determine if it is consistent with the language of the regulation and with the purpose which the regulation is intended to serve. *Id.* Our review of the AAU's decision is *de novo. See Morton*, 158 N.H. at 76.

NEW HAMPSHIRE ADMINISTRATIVE RULES, Parts He-C 200 and He-M 503, the rules at issue in this case, have been amended since the Area Agency terminated the residential care contract with Jennifer Cavalli in November 2006. The AAU applied the relevant portions of New Hampshire Administrative Rules, He-C 200, governing practice and procedure, as amended in 2007. With respect to NEW HAMPSHIRE ADMINISTRATIVE RULES, He-M 503, the substantive rules upon which the Area Agency relied, the AAU applied the administrative rules in effect as of November 2006. The parties do not challenge the AAU's decision in this regard, nor do they argue that any meaningful difference exists between the prior and amended rules that would affect the outcome of this case. Accordingly, we consider the versions of the rules relied upon by the AAU. We further note that the amended versions of the rules that we cite herein remain largely unchanged in substance.[1]

We first provide a framework of the relevant rights and procedures afforded to persons with developmental disabilities under state law and the DHHS rules. DHHS is charged with providing "a comprehensive and coordinated system of health and human services as needed to promote and protect the health, safety, and well-being of the citizens of New Hampshire." RSA 126-A:4, I (2005); *see also* RSA 126-A:1 (2005) (declaration of purpose). Among its various responsibilities, the department must "establish, maintain, implement and coordinate a comprehensive service delivery system for developmentally disabled persons." RSA 171-A:1 (Supp. 2008).

---

[1] All administrative rules cited hereinafter fall within the following: NEW HAMPSHIRE ADMINISTRATIVE RULES, Part He-C 200 (effective April 2007) and Part He-M 500 (effective January 1999), unless otherwise noted.

As declared by the legislature: "The policy of this state is that persons with developmental disabilities and their families be provided services that emphasize community living and programs to support individuals and families, beginning with early intervention." *Id.* In particular, the department is required to "maintain a state service delivery system for the care, habilitation, rehabilitation, treatment and training of developmentally disabled persons." RSA 171-A:4 (2002).

Persons with developmental disabilities may apply for a service with an area agency within their geographic area. *See* RSA 171-A:2, V (Supp. 2008) (defining developmental disability); RSA 171-A:2, I-b (defining area agency); RSA 171-A:6, I (Supp. 2008) (setting forth manner of applying for services). The area agency is required to conduct a comprehensive screening evaluation to determine, among other things, the nature of services to be provided to an individual. RSA 171-A:6, II (Supp. 2008). Designated area agencies may utilize funds to establish programs and services for persons with developmental disabilities and may enter into contracts with individuals or organizations to provide programs or services. RSA 171-A:18, I, II (2002).

Participation by a person with developmental disabilities in the state service delivery system is voluntary, RSA 171-A:5, I (2002), and the legislature has crafted rights for persons who choose to participate in the programs, *see* RSA 171-A:14 (2002). The legislature has charged the commissioner of DHHS with adopting rules "relative to the protection of the rights, dignity, autonomy and integrity of clients, including specific procedures to protect the rights established in this chapter," *see* RSA 171-A:14, V, and has required it to adopt rules to implement its various service responsibilities, *see, e.g.*, RSA 171-A:3 (2002); RSA 171-A:9, I (2002); RSA 171-A:12, I (2002); RSA 171-A:18, IV (2002). Additionally, DHHS is statutorily required to provide an appeals process for individuals who apply for or receive services, RSA 126-A:5, VIII (Supp. 2008), and is also required to adopt rules for formal and informal procedures, including adjudicative proceedings, *see* RSA 541-A:16, I(b)(2) (2007). The rules relevant to the matter at hand that DHHS adopted to comply with statutory mandates appear at NEW HAMPSHIRE ADMINISTRATIVE RULES, Part He-C 200, the rules of practice and procedure, and NEW HAMPSHIRE ADMINISTRATIVE RULES, Part He-M 500, the rules governing developmental services.

## III

Parker argues that the AAU erred by failing to consider all of the evidence before it and failing to conduct a *de novo* review. Parker and *amicus* Greenwood argue that the AAU was required to consider all of the evidence before it that was in existence at the time of the June 2007

evidentiary hearing and to decide *de novo* whether Parker's continued placement at the Cavalli home with Miller exceeded the "bounds of reasonable risks" under Rule 503.08(c)(4). They contend that the AAU erroneously acted as an appellate tribunal by considering only the evidence that existed when the Area Agency decided to terminate the contract in November 2006.

The Area Agency contends that the AAU in fact weighed all of the evidence before it, including evidence that arose after the Area Agency's November 2006 decision. It further contends that Parker's argument concerning *de novo* review was not preserved for appellate review. DHHS, as *amicus curiae*, argues that the AAU properly reviewed only evidence existing at the time of the Area Agency's November 2006 decision. According to DHHS, evidence arising subsequent to the Area Agency's decision "might have been grounds for the [p]etitioner to ask the area agency to enter into a new agreement with Ms. Cavalli, but [was] not grounds to completely recast the nature of the administrative appeals process."

We first conclude that Parker's argument concerning *de novo* review was preserved. *See Fox v. Town of Greenland*, 151 N.H. 600, 604 (2004) (party must raise objection at earliest possible time in litigation process in order to preserve an issue for appellate review). At the June 2007 hearing, the AAU allowed evidence that was in existence at the time of the Area Agency's decision in November 2006, as well as evidence later generated. From the face of the AAU order, it appears that the AAU considered all evidence that was before it. However, in its order denying Parker's motion for reconsideration, the AAU indicated for the first time that it had limited its role to that of an appellate-type tribunal and essentially disregarded evidence generated after November 7, 2006. This is not a case where Parker alleges an error that she could have discovered and sought to correct at some earlier time, but chose to ignore. *See id.* She objected to the limited review undertaken at the earliest opportunity. Accordingly, we conclude that Parker's argument was timely raised and properly preserved for our review.

We next review the AAU's role in deciding Parker's appeal. Parker's appeal was governed by the procedural rules prescribed in NEW HAMPSHIRE ADMINISTRATIVE RULES, He-C 200. Notably, these procedural rules govern a multitude of DHHS decisions and are not restricted to appeals brought by persons with developmental disabilities regarding services. *See, e.g.*, N.H. ADMIN. RULES, He-P 2150.29 (decisions concerning shellfish certificates); *id.* He-W 507.05 (decisions affecting eligibility for medical assistance for children with severe disabilities). While Parker relied in part

upon federal Medicaid law to advance her argument for *de novo* review, we decide this appeal solely under state law and administrative rules.

Under the rules, an "appeal" is defined as "a request by a person adversely affected by a department decision or action to *review that decision or action* in accordance with the provisions of RSA 126-A:5, VIII." N.H. ADMIN. RULES, He-C 201.02(b) (emphasis added). Reviewing a department action or decision necessarily involves examining that action or decision itself to determine whether it contains error. *See, e.g.*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1944 (unabridged 2002) (definition of "review"). It is the validity of the department's decision or action that forms the basis for the appeal. *See also* N.H. ADMIN. RULES, He-C 203.03(b) (appealing party must identify the specific department decision or action that forms the basis of the appeal). Therefore, the AAU's role in this case was to review whether the Area Agency's November 2006 decision was erroneous.

■ Parker correctly argues that the AAU was obligated to conduct a *de novo* review of the challenged decision. Under the rules, the appeal review must be conducted "in accordance with the provisions of RSA 126-A:5, VIII." N.H. ADMIN. RULES, He-C 201.02(b). Among other things, that statutory provision requires that the DHHS commissioner establish an appeals process for any individual who is applying for or receiving services from the department, and that such appeals process must provide an opportunity for an appealing party to choose either a hearing or an independent review "to determine the facts of the matter on appeal," RSA 126-A:5, VIII(a) (Supp. 2008). This language plainly indicates that during the appeals process, the hearings officer must conduct a *de novo* review of all the evidence and render factual findings. It would make little sense for the legislature to require determinations of fact on appeal had it intended that the AAU limit its review to whether the appealed decision was sustainable based upon the record in existence at the time the initial decision was rendered. Requiring determinations of fact anticipates that the appeal process involve a *de novo* adjudication.

The "purpose" section and definition of "hearing" under the rules also presuppose a *de novo* review of the challenged department decision or action. *See* N.H. ADMIN. RULES, He-C 201.01 ("purpose" section); N.H. ADMIN. RULES, He-C 201.02(i) (definition of "hearing"). Both rules refer to specific sections of the Administrative Procedure Act to inform their intent and meaning; namely, RSA 541-A:16, I, and RSA 541-A:31 through RSA 541-A:36, respectively. Under RSA 541-A:16, I(b)(2) (2007), each agency, including DHHS, is required to adopt rules governing "adjudicative proceedings" that conform with certain statutorily prescribed procedures.

*See* RSA 541-A:1, I (2007) (defining "adjudicative proceedings"). The statutory procedures bear all the hallmarks of a full evidentiary proceeding with *de novo* review of the facts and law. *See* RSA 541-A:31-:36 (2007). For example, the parties must have the opportunity to "present evidence," RSA 541-A:31, IV (2007), which may include witness testimony and documentary evidence, RSA 541-A:33, II, III (2007). Also, parties must have the opportunity to "conduct cross-examinations required for a full and true disclosure of the facts." RSA 541-A:33, IV (2007). Finally, the applicable administrative rules indicate that a *de novo* assessment of fact and law should be undertaken during the appeals process. *See, e.g.,* N.H. ADMIN. RULES, He-C 203.08 (prehearing exchange of information); *id.* 203.14 (burden and standard of proof); *id.* 203.18 (admission of evidence).

 Accordingly, we hold that the AAU was obligated to conduct a full evidentiary hearing, independently review the evidence and make a decision regarding whether Parker's residential placement was within the bounds of reasonable risks without deference to the Area Agency's original decision. *See Doe v. U.S.,* 821 F.2d 694, 697-98 (D.C. Cir. 1987) (defining ordinary understanding of *de novo* review); *cf. Appeal of Staniels,* 142 N.H. 794, 796 (1998) (compensation appeals board's *de novo* review of decision of department of labor is limited to determining employee's condition as it existed when department decision was made).

In this case, the AAU conducted a full evidentiary hearing with testimony from several witnesses, cross-examination and the admission of numerous documents. We agree with Parker, however, that the AAU improperly limited its review to that evidence which existed at the time that the Area Agency made its decision in November 2006. The issue before the AAU was, rather, the *circumstances* existing in November 2006; thus, it failed to properly conduct the required *de novo* review.

The evidence admitted at the AAU hearing included information that was available to the Area Agency in November 2006 when it determined that Parker's continued residence with Miller would exceed the bounds of reasonable risks. Evidence generated after November 2006 was also admitted, such as an opinion by a psychologist, Dr. Andrew Prokopis, that he rendered in January 2007. The AAU order denying Parker's motion for reconsideration explained its consideration of the evidence:

> In this case, the focus is on the decision made by the Area Agency on November 7, 2006. The most relevant evidence is the evidence that existed on November 7, 2006, and upon which the Area Agency could have based its decision. The least relevant evidence in this case is evidence that did not exist on or before November 7, 2006, and which could not have played any role in the

Area Agency's decision. The passage of time, new events, and changed opinions in this case do not demonstrate that the Area Agency erred in terminating the provider's contract. [Parker's] argument relies upon the least relevant evidence to make her case, which is simply not persuasive.

This was error.

The issue before the AAU was, as noted above, whether *the circumstances*, not the evidence, existing as of November 7, 2006, when the Area Agency made its decision, demonstrated that Parker's continued residence with Miller would exceed the bounds of reasonable risks. Conducting a *de novo* review required the AAU to fully consider all relevant evidence in order to independently determine this issue. Indeed, the administrative rules mandate that the AAU accept and consider an expansive scope of evidence to allow for a full consideration of the issue before it. For instance, NEW HAMPSHIRE ADMINISTRATIVE RULES, He-C 203.18(c) provides that: "All documents, materials and objects offered in evidence as exhibits and which were disclosed prior to the hearing in accordance with He-C 203.08 *shall, absent objection, be included in the record of the hearing*." (Emphasis added.) Even those documents not previously disclosed must be accepted into the record if the AAU hearings officer "determines that such evidence, exhibits or arguments are *necessary to a full consideration of the issues raised in the appeal*." N.H. ADMIN. RULES, He-C 203.18(d) (emphasis added); *see also id.* 203.21(a); *id.* 204.05(a). The AAU was not confined to relying upon only that evidence which was generated by the Area Agency during its investigation. *Cf. Staniels*, 142 N.H. at 797 (compensation appeals board considered evidence of employee's surgery which occurred after decision of hearings officer to determine *de novo* the employee's medical condition at the time of the challenged decision); *Doe*, 821 F.2d at 698 (trial court's *de novo* review of administrative decision was not constricted by administrative record).

Therefore, to the extent that the evidence generated after the Area Agency's decision shed light on the circumstances existing as of November 7, 2006, the AAU was obligated to consider it. Because the AAU deemed some evidence less relevant based solely upon the fact that it came into existence after the Area Agency rendered its decision in November 2006, we conclude that it limited its role to that of an appeal tribunal. This was error.

## IV

We next consider Parker's argument that the Area Agency failed to present sufficient evidence that her continued residence with Miller at the

Cavalli home would exceed the bounds of reasonable risks. The Area Agency had the burden of proving by a preponderance of the evidence that the circumstances existing in November 2006 demonstrate that Parker's decision to continue to reside with Miller at the Cavalli home exceeded the bounds of reasonable risks. *See* N.H. ADMIN. RULES, He-C 203.14(f). We conclude that it failed to carry its burden.

The phrase "bounds of reasonable risks" is not defined within the administrative rules and, thus, we look to the plain meaning of its terms. "Reasonable" means, in pertinent part: "[f]air, proper, or moderate under the circumstances," BLACK'S LAW DICTIONARY 1293 (8th ed. 2004), and, further

> 1.a. being in agreement with right thinking or right judgment: not conflicting with reason: not absurd: not ridiculous . . . b. being or remaining within the bounds of reason: not extreme: not excessive . . . 2.a. having the faculty of reason: RATIONAL . . . b. possessing good sound judgment: well balanced: SENSIBLE . . . .

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1892 (unabridged ed. 2002). *See Lambert v. Belknap County Convention*, 157 N.H. 375, 380 (2008) (relying upon dictionary definitions for common understanding of terms). In the negligence context, reasonableness is objectively determined. *See Gelinas v. Metropolitan Prop. & Liability Ins. Co.*, 131 N.H. 154, 161 (1988). The notion of reasonable risk includes examining both the likelihood that harm will occur and the magnitude of the harm to which the person is exposed. *See Remsburg v. Docusearch*, 149 N.H. 148, 153 (2003). Thus, reasonable risk may be calculated on a continuum of sorts. On one hand, the likelihood of harm may be significant, but its magnitude may be so small that a reasonable person would accept the risk. On the other hand, the likelihood of harm may be far less, yet the magnitude of the possible harm is so significant that a reasonable person would not accept the risk. Ultimately, risk of harm is part of everyday life, and reasonable persons commonly choose to engage in activities that involve exposure to some risk of harm.

■ ■ This concept of reasonable risk accords with the statutory and administrative policies that require services be provided to persons with developmental disabilities in a manner that respects independence and autonomy in decision-making. For instance, the provision of services and programs must be based, in part, upon:

> I. Participation of people with developmental disabilities and their families in decisions concerning necessary,

> desirable, and appropriate services, recognizing that
> they are best able to determine their own needs.
>
> . . . .
>
> V. Services based on individual choice, satisfaction, safety,
> and positive outcomes.

RSA 171-A:1, I, V. Further, the purpose of the administrative rules which govern the eligibility for services and the process of providing services is

> to establish standards and procedures for the determination of
> eligibility, the development of service agreements, the provision
> and monitoring of services *which maximize the ability and
> decision-making authority of persons with developmental dis-
> abilities*, and the withdrawal or termination of such persons from
> these services.

N.H. ADMIN. RULES, He-M 503.01 (emphasis added); *see also id.* 503.08(b) (services designed to "promote the individual's personal development and quality of life in a manner that is determined by the individual"); *id.* 503.08(d) (services environment "shall promote the person's freedom of movement, ability to make informed decisions, [and] self-determination"); *id.* 503.08(e) ("[a]n individual . . . may select any person, any agency, or another area agency as a provider to deliver one or more of the services identified in the individual's service agreement"). Accordingly, to guide our analysis of whether sufficient evidence was presented to demonstrate that a shared residence between Parker and Miller at the Cavalli home would exceed the "bounds of reasonable risks," we examine whether a reasonable person would have voluntarily chosen to expose himself or herself to the measure of risk involved as the circumstances existed on November 7, 2006.

By all accounts, Parker and Miller are good friends and share a healthy, sibling-type relationship. The evidence shows that while the two argued on occasion, Miller and Parker are able to respect each other's boundaries in times of conflict without Miller engaging in dangerous behavior. We acknowledge that Miller's history prior to living at the Cavalli home showed a potential for unpredictable aggression. There is no evidence in the record, however, that Miller has ever threatened Parker in any way or engaged in conduct at the Cavalli home that would threaten her safety.

Dr. Prokopis, who is a clinical psychologist with special training to work with persons with developmental disabilities and domestic violence, unequivocally opined that the living arrangement between Parker, Miller and Vincent and Jennifer Cavalli presented a "very low risk" to Parker and "should be continued" with periodic review. While immediately after the October 2006 Easter Seals incident, Dr. Prokopis recommended to the Area

Agency that Miller live in a single-person placement without a roommate, he later changed his opinion after conducting several therapy sessions with Miller and meeting with Mr. Cavalli, Parker, and Easter Seals staff. Dr. Prokopis is familiar with Miller's troubled background, and explained that he had changed his initial recommendation because he thought that the Easter Seals staff did not handle Miller well on the day of the incident, that Mr. Cavalli was able to handle Miller "extremely well," and that Miller's ability to live in a family situation at the Cavalli home for more than one year without incident was "quite remarkable." His testimony was reflective of the circumstances as they existed on November 7, 2006, and he ultimately opined that there was a "very low probability" that Miller would engage in behavior similar to that exhibited at Easter Seals in October 2006, either in the Cavalli home or toward Parker.

■ The evidence documenting the communications between the Area Agency and the Easter Seals staff at the time the Area Agency conducted its investigation indicates that everyone thought that Parker's safety could not be guaranteed. Conditioning services for a person with developmental disabilities upon a guarantee of absolute safety, however, is too stringent a measure. Such a standard would prohibit persons with developmental disabilities from receiving funding when choosing to engage in activities that would expose them to any risk at all. This is contrary to the plain meaning of Rule 503.08(c)(4). The phrase "bounds of reasonable risks" implicitly recognizes that when making life decisions, persons with developmental disabilities may voluntarily expose themselves to circumstances that involve some reasonable risk without jeopardizing the funding for the particular services available to them. Ultimately, even after Miller's aggressive outburst at Easter Seals, both the Easter Seals staff and the Area Agency opined that it was not likely that Miller would engage in similar behavior in the home environment or toward Parker.

The testimony of Beth Raymond, the vice president of individual and family services for the Area Agency, represents the sole evidence that a shared residence would exceed the bounds of reasonable risk. She testified that the living arrangement would present a "significant risk" to Parker due to Miller's past aggression and behaviors. However, at the time the Area Agency first permitted Miller to reside at the Cavalli home in March 2006, Parker was already living there and the Area Agency knew of Miller's past history. Further, Raymond acknowledged that even after Parker was briefly removed from the Cavalli residence during the summer of 2006, she permitted Parker to return to the home and again share the residence with Miller because she perceived no "heightened risk." Moreover, Raymond has permitted the two to occasionally share overnight time at the Cavalli home

even since the October 2006 incident. On this record, Raymond's testimony, standing alone, is not sufficient to carry the Area Agency's burden in this case.

We conclude that the Area Agency failed as a matter of law to prove by a preponderance of the evidence that the circumstances existing as of November 7, 2006, demonstrated that Parker's decision to continue to reside with Miller at the Cavalli home exceeded the "bounds of reasonable risks." We recognize that the autonomy of a person with developmental disabilities is not without limits. *See, e.g.,* N.H. ADMIN. RULES, He-M 503.08(f) (area agency must terminate service agreement if "provider chosen by the individual . . . is not acting in the best interest of the individual or in compliance with applicable rules"); *id.* 503.08(g) (area agency shall terminate agreement if service provider "is posing an immediate and serious threat to the health or safety of the individual"); RSA 171-A:18. However, when, as here, the Area Agency's decision is appealed, the AAU must conduct a *de novo* review and independently determine whether the Area Agency met its burden of proving by a preponderance of the evidence that exposure to the particular risk at issue exceeds the "bounds of reasonable risks." Because the Area Agency failed to present sufficient evidence to carry its burden of proof in this case, we reverse.

*Reversed.*

DALIANIS, DUGGAN and HICKS, JJ., concurred.