# THE STATE OF NEW HAMPSHIRE

# SUPREME COURT

### In Case No. 2018-0617, Appeal of Suzanne Fournier & a., the court on November 14, 2019, issued the following order:

Having considered the briefs and oral arguments of the parties, the court concludes that a formal written opinion is unnecessary in this case. The appellants, Suzanne Fournier, Rajiv and Debra Garg, Adam Goess, and Gabriela Juocys, appeal an order of the New Hampshire Water Council upholding the issuance of an alteration of terrain permit by the New Hampshire Department of Environmental Services, Alteration of Terrain Bureau (DES) to the Town of Milford (Town). We affirm in part, reverse in part, and remand.

The pertinent facts are as follows. On September 18, 2017, DES issued an alteration of terrain permit to the Town to conduct a gravel mining operation on property referred to as the Brox Community Lands. This town-owned property is a known habitat for certain species that have been identified by New Hampshire Fish and Game (Fish & Game) as threatened or endangered, specifically, the eastern hog-nosed snake, Blanding's turtle, and spotted turtle. One month after the permit issued, the appellants, including a regular visitor to the Brox property as well as owners of land abutting the property, filed a notice of appeal with the Water Council, challenging DES' issuance of the permit. The appeal was rooted in the appellants' concern that the excavation would result in adverse impacts to the threatened and endangered species located on the Brox property. Following a two-day hearing, a majority of the Water Council, in a four-to-three vote, denied the appeal. This appeal followed.

The Town, as well as Northeast Sand & Gravel, the company employed by the Town to excavate the Brox property, are intervenors in this appeal. The appellants contend that the following determinations by the Water Council were erroneous: (1) DES properly applied the standard set forth in its own regulation governing the issuance of alteration of terrain permits when it issued a permit to the Town, see N.H. Admin. R., Env-Wq 1503.19(h); and (2) DES acted lawfully when it issued the permit without including proposed construction work to a haul road located on the property.

Our review of Water Council decisions is governed by RSA chapter 541. See RSA 21-O:14, III (2012). To set aside an order of the Water Council, the appellants must show that the order is "clearly unreasonable or unlawful." RSA 541:13 (2007). All findings of the Water Council upon all questions of fact properly before it shall be deemed to be prima facie lawful and reasonable.

Appeal of Town of Lincoln, 172 N.H. 244, 247 (2019). "[T]he order or decision appealed from shall not be set aside except for errors of law, unless the court is satisfied, by a clear preponderance of the evidence before it, that such order is unjust or unreasonable." RSA 541:13. We review the Water Council's rulings on issues of law de novo. Appeal of Town of Lincoln, 172 N.H. at 247.

The crux of the appellants' primary argument on appeal is that DES applied the incorrect standard in issuing an alteration of terrain permit to the Town. Pursuant to DES' rules governing the issuance of such permits, "[t]he department shall not issue [a] permit unless the applicant demonstrates that . . . [t]he project has been designed in a manner that will not result in adverse impacts to state- or federally-listed threatened or endangered species." N.H. Admin. R., Env-Wq 1503.19(h) (emphasis added). The appellants argue that DES failed to comply with Env-Wq 1503.19(h) when it issued a permit for a project designed to minimize adverse impacts, rather than prevent them. We agree.

When interpreting administrative rules, we apply the same principles of construction that pertain to our interpretation of state law. Petition of Parker, 158 N.H. 499, 502 (2009). We ascribe the plain and ordinary meanings to words used, looking at the rule or statutory scheme as a whole, and not piecemeal. Id. Although we accord deference to an agency's interpretation of its own regulations, that deference is not total. Id. We still must examine the agency's interpretation to determine if it is consistent with the language of the regulation and with the purpose that the regulation is intended to serve. Id. We review the Water Council's interpretation of administrative rules de novo. See Appeal of Morton, 158 N.H. 76, 78 (2008).

DES and the intervenors argue that DES' interpretation of Env-Wq 1503.19(h) — that the project is in compliance with the regulation if it is designed merely to minimize impacts to threatened or endangered species — finds some support in the language of the Endangered Species Conservation Act (ESCA), which directs "state departments and agencies" to "take such action as is reasonable and prudent to insure that actions authorized, funded, or carried out by them do not jeopardize the continued existence of such species." RSA 212-A:9, III (2019). DES contends that the department took reasonable and prudent action when it promulgated Env-Wq 1503.19(h), and when it issued the permit to the Town. DES asserts that its issuance of the permit was reasonable and prudent because its interpretation of the rule ensured that the department's action in issuing the permit "d[id] not jeopardize the continued existence of [threatened or endangered] species," as required by RSA 212-A:9, III.

To adopt DES' reasoning, however, would, for all practical purposes, read DES' regulation out of existence. See Appeal of Morrissey, 165 N.H. 87, 96-97

2

(2013) (stating that we will not interpret an administrative rule in a manner that would render it meaningless). Once DES chose to promulgate Env-Wq 1503.19(h), it then became the department's responsibility to comply with the plain meaning of its regulation. DES cannot now side-step its own regulation by relying, instead, on the language of the ESCA. Importantly, for the purposes of this appeal, we are not tasked with deciding whether DES' interpretation of Env-Wq 1503.19(h) comports with the ESCA, but rather whether DES complied with the regulation itself.[1]

The law is well settled that an administrative agency must follow its own rules and regulations, and that an agency's interpretation of its own regulations is erroneous as a matter of law when it fails to embrace the plain meaning of its regulations. Appeal of Union Tel. Co., 160 N.H. 309, 317 (2010); Attitash Mt. Service Co. v. Schuck, 135 N.H. 427, 429 (1992); Appeal of the City of Nashua, 121 N.H. 874, 876 (1981). Ascribing to each word in the regulation its plain and ordinary meaning, see Petition of Parker, 158 N.H. at 502, we are not persuaded by DES' and the intervenors' argument that there is no material difference between, on the one hand, designing a project that will minimize impacts to threatened or endangered species, and, on the other hand, designing a project so that it will not adversely impact such species.

In support of their argument that DES applied the correct standard in issuing the permit, DES and the intervenors point to evidence in the record that both DES and Fish & Game were aware of the actual language used in Env-Wq 1503.19(h). This awareness means little, however, when the record makes clear that Fish & Game's acknowledged goal in suggesting revisions to the proposed plans was not to design a project that would "not result in adverse impacts," as required by the rule, but rather to "minimize" and "reduce" impacts to threatened or endangered species.

In an effort to validate the misapplication of its own regulation, DES asserts that the ESCA confers upon Fish & Game primary jurisdiction over threatened and endangered species in New Hampshire, as it "empowers and directs [Fish & Game] to conduct investigations, adopt and enforce rules, and perform other functions to protect threatened and endangered species." See RSA 212-A:2, II (2019); :5 (2019). DES argues that, given Fish & Game's authority and expertise in this area, DES defers entirely to Fish & Game to determine whether a project is designed in a manner that will protect such species. DES contends that, once Fish & Game determines the conditions and revisions to be included in the permit, DES' responsibility is merely to enforce

---

[1] The question whether the rule comports with the ESCA, or whether it might be ultra vires as written, is an issue for another day. See Bach v. N.H. Dep't of Safety, 169 N.H. 87, 94 (2016) (declaring as ultra vires administrative rules that "add to, detract from, or modify the statute which they are intended to implement") (quotation omitted)). It has not been raised by the parties, nor do we have the record before us to decide the issue.

compliance with the conditions set forth in the final permit. However, DES fails to acknowledge that this approach is missing a necessary step: that DES ensure that Fish & Game applied the correct standard when evaluating and modifying the project design. That it may be generally appropriate for DES to defer to Fish & Game's expertise in revising the project's design does not in any way lessen DES' responsibility to review Fish & Game's proposed modifications to ensure that Fish & Game has applied the proper standard as set forth in the rule — that the project has been designed in such a way that it will not result in adverse impacts to threatened or endangered species.

Moreover, there is ample evidence in the record that DES itself adopted and applied the less demanding "minimization of impacts" standard. In a request for more information from the Town, DES stated that it was the department's "understanding that further discussions with [Fish & Game were] required to determine what should be done to minimize any impacts to threatened and endangered species on the site." (Emphasis added). In addition, DES staff consistently referred to the "minimization of impacts" standard in testimony before the Water Council. For example, at the hearing, the DES employee responsible for reviewing the Town's application testified that the goal of discussions between DES, Fish & Game, and the Town was to determine how "best to minimize . . . any issues with the threatened and endangered species." Most notable, however, is that the "minimization" language used by Fish & Game throughout the permitting process also appears on the approved site plan. Operations and conditions listed on the plan itself include the following language: "To minimize the impacts to the species this project will be excavated in phases"; the town will take certain measures to "minimize direct impacts to threatened and endangered wildlife"; and the town will take steps in the future "to ensure that impacts to threatened and endangered wildlife are minimized."

In further support of the department's argument that there is no substantive difference between a project designed to minimize impacts to threatened or endangered species versus one designed in a manner that will not result in adverse impacts to such species, DES points to testimony from a Fish & Game employee involved in reviewing the Town's permit application. At the hearing, the Fish & Game employee testified that a "take"[2] of threatened or endangered species "is possible in both scenarios": whether a project is designed to avoid all adverse impacts or merely to minimize impacts. DES asserts that while "the intent is always avoidance of adverse impacts, [Fish & Game] often uses the language of minimization in recognition of the fact that no project can avoid all impacts to [threatened and endangered] species."

---

[2] "Take," as defined by RSA chapter 207, General Provisions as to Fish and Game, includes pursuing, hunting, and trapping wildlife, as well as "lesser acts," such as disturbing and worrying wildlife. RSA 207:1, XXVII (2019). It also includes "every attempt to take and every act of assistance to every other person in taking or attempting to take wildlife." Id.

Although the argument posed by DES is not without basis, we cannot discern how the possibility of actual adverse impacts after <u>implementation</u> of a project has any bearing on whether DES has ensured that the project has been <u>designed</u> in a manner that will not result in adverse impacts to threatened or endangered species. As the appellants correctly point out, a project designed to minimize impacts contemplates some level of impact, while a project designed to not result in adverse impacts has the goal of avoiding adverse impacts entirely. Whether, after implementation, impacts actually result from either design should not in any way relieve DES of its responsibility to comply with the "no adverse impact" rule.

DES also argues that repeated references by DES and Fish & Game to a "minimization of impacts" standard did not reflect material divergence from the "no adverse impact" standard set out in the regulation, because, in reality, application of a more demanding standard would preclude DES from issuing alteration of terrain permits any time threatened or endangered species are present on a project site. In so arguing, DES relies on testimony of the administrator of the Alteration of Terrain Bureau at the hearing before the Water Council that designing projects to result in "no impact" would lead to "no development." However, DES fails to address testimony before the Water Council offered by an environmental consultant, who performed a Natural Resource Inventory on the Brox property for the Milford Conservation Commission, that it is indeed possible to design a project so that it will not result in adverse impacts to threatened or endangered species. Focusing on the lack of studies conducted prior to issuance of the permit to the Town, the environmental consultant opined that the project had not been designed to avoid adverse impacts. He explained that this failure could have been remedied if Fish & Game had conducted studies on the Brox property <u>before</u> the Town began excavation, rather than <u>during</u> the excavation as provided for in the permit, to understand how each of the threatened or endangered species use the property. He testified that when these studies take place before implementation of a project, it is possible, based on the information gleaned from the studies, to design <u>around</u> the threatened or endangered species' use of the property. Although it is unnecessary for the purposes of this order to determine whether the project was designed in a manner that would satisfy the "no adverse impact" standard of Env-Wq 1503.19(h), given this testimony, we are not convinced that application of the more demanding standard in the rule would inevitably result in the denial of alteration of terrain permits whenever threatened or endangered species are present on a project site.

In response to the appellants' concern that there are greater impacts to threatened or endangered species in implementing a project designed to minimize impacts rather than avoid them, DES contends that this concern is unfounded because alteration of terrain permits, once issued, do not allow for the take of threatened or endangered species. DES asserts that, because

5

alteration of terrain permits clearly state that the Town is not absolved "from due diligence in regard to state, local or federal laws regarding such . . . species," and because the ESCA prohibits the take of threatened or endangered species, RSA 212-A:7, I(a) (2019), under the terms of the permit, the Town remains responsible for avoiding an actual take or being liable for the result of its actions.  The boiler plate language referred to by DES applies only to unlawful takes that may occur in <u>implementing</u> the project, however, and thus has no bearing on whether DES applied the correct standard in reviewing the <u>design</u> of the project.  Because neither DES nor Fish & Game applied the more demanding standard articulated in Env-Wq 1503.19(h) when issuing the Town's permit, the order of the Water Council upholding the issuance of the permit is unlawful.  <u>See</u> RSA 541:13 (2007).

The final issue before us is whether the Water Council acted reasonably and lawfully when it upheld DES' issuance of a permit that did not include a haul road located on the Brox property.  According to DES regulations, roads associated with "areas proposed to be disturbed as part of the total project" must be considered "for purposes of determining the need for an [alteration of terrain] permit."  <u>N.H. Admin. R.</u> Env-Wq 1503.12(a)(1).  As DES correctly points out, the portion of the haul road at issue was not associated with the "areas proposed to be disturbed" by the Town's project.  Instead, the Town's permit application stated that the length of roadway to be included in the proposed project was "[zero] linear feet," and the Town's project narrative indicated that the improvements to the haul road would include only reconstruction and upgrading of an existing roadway.  Notably, prior to issuing the permit, DES sent a request for more information to the Town, inquiring about where improvements to the haul road would occur and explaining that any improvements to the road not covered by the existing application would need to be added before a permit could be issued.  The Town responded that all improvements to the road would be classified as "roadway maintenance . . . not subject to an [alteration of terrain] review."  Following this exchange, DES issued the permit without including the haul road.

The appellants assert that, despite the Town's representations to DES, the Town has conducted "significant roadway construction" to the haul road that exceeds maintenance of an existing roadway and includes "a striking widening of the road."  The parties agree that, if the appellants' factual assertions regarding the haul road are true, and the construction is outside the scope of the permit, DES could begin an enforcement action to halt the unpermitted activity.  <u>See</u> RSA 21-O:14, I (Supp. 2018) (distinguishing between a "department permitting decision" and a "department enforcement decision").  The parties disagree, however, as to whether the appellants' appeal of DES' decision to issue a permit is an appropriate occasion to raise such an argument.

The appellants contend that this appeal is a proper vehicle, as the substantive issue is "whether DES failed to take all appropriate and reasonable steps to ensure that the application was complete when filed." They argue that, given the Town's disclosure to DES that the haul road would be used to transport "tri-axles, 10-wheelers, and tractor trailer dump trucks" to and from the excavation site, DES should have realized that more than mere "maintenance" would occur, and, therefore, that it should have included the haul road within the scope of its permit review. However, as DES correctly notes, the department's responsibility when deciding whether to issue an alteration of terrain permit is not to "make operational decisions for an applicant," but to review a proposed project to determine whether the criteria for issuance of a permit have been met. See N.H. Admin. R., Env-Wq 1503.19.

Importantly, as noted above, the appellants are not without remedy. Indeed, a DES employee testified at the Water Council hearing that DES relies on individuals like the appellants — those who live near the affected property — to learn of potential permit violations. The employee also testified that it is generally only after these violations are reported that DES conducts a site visit to inspect the property for compliance. Given the appellants' complaint, DES has now been made aware of the Town's possible violation and is well-situated to take any appropriate further action.

In conclusion, we affirm the Water Council's decision that DES properly issued the alteration of terrain permit without including the haul road. We reverse the Water Council's decision upholding DES' issuance of the permit under a standard inconsistent with the plain language of Env-Wq 1503.19(h). Because DES and Fish & Game applied the incorrect standard in evaluating the Town's permit application, we conclude that DES' grant of the permit was unlawful. We remand for further proceedings consistent with this order.

Affirmed in part; reversed in part; and remanded.

HICKS, BASSETT, and DONOVAN, JJ., concurred; HANTZ MARCONI, J., concurred in the result.

HANTZ MARCONI, J., concurring in the result. While I think it may be possible to construe Env-Wq 1503.19(h) in the manner urged by DES, I would not reach that issue. Instead, I would hold that, regardless of whether the rule is construed to require that projects be designed in a manner that results in no adverse impacts, or to merely require that they be designed to result in minimal adverse impacts, given the lack of studies conducted prior to the issuance of the permit there is insufficient evidence that the project was designed to meet either standard. Accordingly, I concur in the result.

**Eileen Fox,**
**Clerk**