NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Department of Health and Human Services
No. 2018-0092


PETITION OF KYLE GUILLEMETTE
(New Hampshire Department of Health and Human Services)

Argued: October 24, 2018
Opinion Issued: December 7, 2018


Disability Rights Center-NH, of Concord (James Ziegra on the brief and orally), for the petitioner.

Shaheen & Gordon, P.A., of Concord (Karyn P. Forbes and Alexander W. Campbell on the brief, and Ms. Forbes orally), for Monadnock Worksource.

John D. MacIntosh, P.C., of Concord (John D. MacIntosh on the memorandum of law), for Monadnock Developmental Services.

Gordon J. MacDonald, attorney general (Laura E. B. Lombardi, senior assistant attorney general, on the brief and orally), for the New Hampshire Department of Health and Human Services, Bureau of Developmental Services.

HICKS, J.  In this petition for a writ of certiorari, see Sup. Ct. R. 11, the petitioner, Kyle Guillemette, challenges the determination by the Administrative Appeals Unit (AAU) of the New Hampshire Department of Health and Human Services (DHHS) that the notice requirements set forth in RSA 171-A:8, III (2014) and New Hampshire Administrative Rules, He-M 310.07 did not apply when Monadnock Worksource (Worksource) notified Monadnock Developmental Services (MDS) of its intent to discontinue providing services to the petitioner because that act did not constitute a "termination" of services within the meaning of the applicable rules.  Because we conclude that the AAU's ruling is not erroneous, we affirm.

I.  Facts

The AAU found, or the certified record supports, the following relevant facts.  The petitioner receives developmental disability services funded by the developmental disability Medicaid waiver program.  MDS is the "area agency," which coordinates and develops the petitioner's individual service plan.  See RSA 171-A:2, I-b (2014) (defining an "area agency" as a "nonprofit corporation . . . established by rules adopted by the commissioner [of DHHS] to provide services to developmentally disabled persons"); see also Petition of Sawyer, 170 N.H. 197, 199 (2017) (describing area agencies).  Worksource is a "provider agency."  N.H. Admin. R., He-M 310.02(v) (defining "provider agency").

Worksource provides services to disabled individuals pursuant to a "Master Agreement" with MDS.  Worksource began providing day services to the petitioner in August 2012.  There is no indication in the record that Worksource provided any other services to the petitioner.  On March 31, 2017, Worksource notified MDS, in writing, that Worksource was terminating services to the petitioner "as of midnight on April 30."  The letter to MDS stated that "[t]he Board of Directors and administration of . . . Worksource feel this action is in the best interest of [the petitioner] and of [Worksource]."  The petitioner's mother, who serves as his guardian, was informed by MDS of Worksource's decision on April 3.

On April 12, the petitioner's mother wrote to Worksource, asking it to reconsider its decision to terminate services.  In an April 18 letter, Worksource's executive director declined that request, stating: "As you, the guardian, have repeatedly and recently expressed such deep dissatisfaction with our services to your son, the Board and I feel that you and [the petitioner] would be better served by another agency . . . ."  Thereafter, the petitioner filed a complaint with the Office of Client and Legal Services alleging that his services had been terminated improperly and requesting that they remain in place pending the outcome of the investigation of his complaint.  See RSA 171-A:19 (2014) (establishing the client and legal services office); see also N.H. Admin. R., He-M 310.07(e) (providing that services must remain in place while

2

a client's appeal of a provider agency's termination of services is pending).  The petitioner simultaneously appealed Worksource's decision to the AAU.

The Office of Client and Legal Services investigator determined that Worksource was required to follow the applicable rules when terminating services to a client, and that Worksource had failed to comply with them.  In his written report, the investigator stated that the executive director of Worksource "acknowledged that . . . [Worksource] mistakenly did not follow the termination process under [the rules] . . . , but issued a letter to MDS indicating that [it was] terminating [the petitioner's] day services.  She explained that the contract with MDS is what [Worksource] used as the authority for terminating services."  The investigator reasoned that because "Worksource, as a provider agency of MDS, has to follow the [rules] to terminate services, and admittedly did not, the complaint is substantiated."  Worksource declined to accept the investigator's determination and asked that the matter be referred to the Bureau of Developmental Services (Bureau) for review.  The Bureau overturned the investigator's determination.

The petitioner appealed the Bureau's decision to the AAU.  His appeal of the Bureau's decision was consolidated with his earlier appeal of Worksource's decision.  In ruling in favor of Worksource, the AAU assumed without deciding that, "as a provider agency[,] Worksource [is] bound by the requirements set forth" in the applicable rules.  However, the AAU determined that those requirements did not apply because Worksource did not "terminate" services to the petitioner within the meaning of the applicable rules.  The AAU denied the petitioner's subsequent motion for reconsideration, and this petition for a writ of certiorari followed.

II.  Analysis

A.  Standards of Review

A petition for a writ of certiorari is the only mechanism for review of a fair hearings decision issued by the AAU.  See Petition of Sawyer, 170 N.H. at 202.  "Review on certiorari is an extraordinary remedy, usually available only in the absence of a right to appeal, and only at the discretion of the court."  Id. (quotation omitted).  "Our review of an AAU decision on a petition for writ of certiorari entails examination of whether the AAU acted illegally with respect to jurisdiction, authority or observance of the law or has unsustainably exercised its discretion or acted arbitrarily, unreasonably or capriciously."  Id. (quotation omitted).  "We exercise our power to grant such writs sparingly and only where to do otherwise would result in substantial injustice."  Id. (quotation omitted).

This case requires us to interpret the statutes and regulations governing services to developmentally disabled individuals.  We review the AAU's statutory and regulatory interpretation de novo.  Id. at 203.  "We use the same

3

principles of construction when interpreting both statutes and regulations." Appeal of Michele, 168 N.H. 98, 102 (2015) (quotation omitted). Thus, "[i]n construing rules, as in construing statutes, where possible, we ascribe the plain and ordinary meaning to the words used." Doe v. N.H. Dep't of Safety, 160 N.H. 474, 477 (2010) (quotation omitted). We interpret legislative or administrative intent from the statute or rule as written and will not consider what the legislature or administrative agency might have said or add language that the legislature or administrative agency did not see fit to include. See Appeal of Michele, 168 N.H. at 102. We construe all parts of a statute or regulation together to effectuate their overall purposes and avoid absurd or unjust results. See id. Thus, we look at the regulatory or statutory scheme "as a whole, and not piecemeal." Petition of Parker, 158 N.H. 499, 502 (2009). Moreover, we do not consider words and phrases in isolation, but rather within the context of the statute or regulation as a whole. See Appeal of Michele, 168 N.H. at 102. Additionally, when the language of a statute or regulation is plain and unambiguous, we need not look beyond the statute or regulation itself for further indications of legislative or administrative intent. See id.

### B. Standing

Before addressing the merits of this case, we briefly consider the Bureau's assertion that the petitioner lacks standing. See Duncan v. State, 166 N.H. 630, 640 (2014) (explaining that "standing is a question of subject matter jurisdiction"). "Standing under the New Hampshire Constitution requires parties to have personal legal or equitable rights that are adverse to one another, with regard to an actual, not hypothetical, dispute, which is capable of judicial redress." State v. Actavis Pharma, 170 N.H. 211, 214 (2017) (quotation and brackets omitted).[1] Here, the petitioner asserts that he did not receive the notice to which he argues he was entitled under RSA 170-A:8, III and Rule 310.07. His claim is sufficient to confer standing.

### C. Statutory and Regulatory Framework

We begin by reviewing the statutory and regulatory framework governing the provision of services to developmentally disabled individuals, such as the petitioner. DHHS is responsible for maintaining, coordinating, and supervising the state's developmental services delivery system pursuant to RSA chapter 171-A. See Petition of Sawyer, 170 N.H. at 199; see also RSA 171-A:1, :4 (2014). The state service delivery system comprises "a comprehensive array of services for the diagnosis, evaluation, habilitation and rehabilitation of developmentally disabled persons, including . . . service coordination,

---

[1] We observe that, in November 2018, the electorate voted to amend Part I, Article 8 of the New Hampshire Constitution to allow taxpayer standing under certain circumstances. Taxpayer standing is not an issue in this case.

4

community living arrangements, employment and day services," and family supports. RSA 171-A:2, XVI (2014).

The stated policy of RSA chapter 171-A "is that persons with developmental disabilities and their families be provided services that emphasize community living." RSA 171-A:1 Introductory Language. Such services must be based upon the participation of disabled individuals "and their families in decisions concerning necessary, desirable, and appropriate services, recognizing that they are best able to determine their own needs." RSA 171-A:1, I. They must also be "based on individual choice, satisfaction, safety, and positive outcomes." RSA 171-A:1, V. In addition, the services must be "relevant to the individual's age, abilities, and life goals." RSA 171-A:1, IV.

To participate in the state service delivery system, persons with developmental disabilities must apply to the area agency serving their geographic area. Petition of Sawyer, 170 N.H. at 199; see RSA 171-A:6, I (2014); N.H. Admin. R., He-M 503.04(b). The area agency is required to conduct a comprehensive screening evaluation to determine, among other things, the nature of services to be provided. Petition of Parker, 158 N.H. at 503; see RSA 171-A:6, II (2014). Area agencies may use funds dispensed by DHHS to establish, operate, or administer programs and services for persons with developmental disabilities and may enter into contracts with individuals or organizations to provide those programs or services. Petition of Parker, 158 N.H. at 503; see RSA 171-A:18, I, II (2014). Thus, "[i]n addition to the basic developmental services provided by regional area agencies, individuals may also receive developmental services through a variety of other programs or institutions." Petition of Sawyer, 170 N.H. at 199; see, e.g., N.H. Admin. R., He-M 507 (community participation services), He-M 524 (in-home services), He-M 525 (participant directed and managed services).

Participation by a person with developmental disabilities in the state service delivery system is voluntary. Petition of Parker, 158 N.H. at 503; see RSA 171-A:5, I (2014). Accordingly, participants "at any time may seek a change in services or withdraw entirely from the service delivery system." RSA 171-A:7 (2014).

In addition, services to a developmentally disabled individual may be terminated pursuant to RSA 171-A:8 (2014). RSA 171-A:8, I, allows "[t]he administrator" to "terminate service to a client" when: (1) "termination is deemed in the best interest of the client"; (2) "the client can function independently without such service"; or (3) "the client has received optimal benefit from such service." Before terminating service, "the administrator" must give the client 30 days' notice unless the client consents to an earlier termination date. RSA 171-A:8, III. As used in RSA 171-A:8, an "administrator" is "the superintendent or chief administrative officer of any facility or of any program or service for the developmentally disabled conducted

under the supervision of the commissioner [of DHHS]." RSA 171-A:2, I (2014); see RSA 171-A:4 (providing that the "state service delivery system" is "under the supervision of the commissioner [of DHHS]").

RSA 171-A:8, II provides that "[i]n every instance of termination, the administrator shall refer the client to the area agency which, in turn, shall recommend an appropriate service, or be responsible for contacting the client at regular intervals after termination for as long as deemed necessary." "The client . . . may seek review of the decision to terminate from the commissioner" of DHHS, and the commissioner's decision is final. RSA 171-A:8, IV.

The legislature has crafted rights for persons who choose to participate in the state service delivery system. Petition of Parker, 158 N.H. at 503; see RSA 171-A:14 (2014). Accordingly, "[t]he legislature has charged the commissioner of DHHS with adopting rules 'relative to the protection of the rights, dignity, autonomy and integrity of clients, including specific procedures to protect the rights established'" in RSA chapter 171-A. Petition of Parker, 158 N.H. at 503 (quoting RSA 171-A:14, V).

Consistent with that mandate, DHHS has adopted Rule 310, which "define[s] the rights of applicants for service or persons who have been found eligible for services . . . and who are being served in the community or in a state-operated designated receiving facility." N.H. Admin. R., He-M 310.01. Among the numerous rights afforded to disabled individuals by Rule 310 are the rights to: (1) be informed by provider agencies of "their rights to evaluations and access to treatment and other services," N.H. Admin. R., He-M 310.03(b)(1); (2) be treated by provider agencies "with dignity and respect at all times," N.H. Admin. R., He-M 310.05(a); and (3) seek changes in services or provider agency at any time, see N.H. Admin. R., He-M 310.06(a)(11). The term "provider agency" refers to either "an area agency or an entity under contract with [such] agency" that is responsible for providing services to developmentally disabled individuals. N.H. Admin. R., He-M 310.02(v).

Suspension of services is governed by Rule 310.08, and termination of services is governed by Rule 310.07. See N.H. Admin. R., He-M 310.08, 310.07. Under Rule 310.08, a provider agency is precluded from suspending services to an individual unless prior written notice has been provided "of the specific behaviors and conduct for which suspension is imposed." N.H. Admin. R., He-M 310.08(a). Such written notice must contain the reason for the suspension, the suspension's length, and an explanation of the individual's right to appeal the suspension. N.H. Admin. R., He-M 310.08(c). The maximum length of a suspension is five days. N.H. Admin. R., He-M 310.08(d).

Rule 310.07 provides that services to individuals who voluntarily receive them shall not be terminated unless:

(1) Such termination is deemed in the best interest of the individual;

(2) The individual can function independently without such service;

(3) The individual has received optimal benefit from the service;

(4) The individual or representative refuses to pay for the services . . . despite having the financial resources to do so; or

(5) The individual or representative refuses to apply for benefits that could cover the cost of the services . . . despite the fact that the individual is or might be eligible for such benefits.

N.H. Admin. R., He-M 310.07(a). Rule 310 further provides that "[p]rovider agencies shall only terminate services to individuals in accordance with RSA 171-A:8," N.H. Admin. R., He-M 310.07(b), and requires that before "any termination of service, the provider agency shall give the individual 30 days' notice . . . in writing," which "[c]ontain[s] the reasons for the termination" and the date on which the termination is effective, and which "[e]xplains that the individual . . . has the right to appeal the termination in accordance with He-M 202 and He-C 200," N.H. Admin. R., He-M 310.07(c)-(d). While such an appeal is pending, services must be continued. N.H. Admin. R., He-M 310.07(e).

DHHS is also required "to adopt rules to implement its various service responsibilities." Petition of Parker, 158 N.H. at 503; see, e.g., RSA 171-A:12, I (2014) (requiring the commissioner to adopt rules relating to the development of individual service agreements), :18, IV (2014) (providing that the commissioner shall "adopt rules establishing standards for the provision of services by area agencies to developmentally disabled persons"). Accordingly, DHHS has adopted Rule 503, which sets forth the "standards and procedures for the determination of eligibility, the development of service agreements, and the provision and monitoring of services" to developmentally disabled individuals. N.H. Admin. R., He-M 503.01.

Rule 503 contains two provisions related to termination of services. Rule 503.07 concerns the mandatory termination by the area agency of a contract with a service provider, chosen by the disabled individual, because the service provider is not implementing the service agreement, is not complying with applicable rules, or poses a threat to the individual's health and safety. See N.H. Admin. R., He-M 503.07(d), (f)-(g). Rule 503.15 concerns the discretionary decision by the area agency director to terminate services to the individual,

upon written recommendation to do so, either because the individual "can function without such service" or because such services "are no longer necessary" as "they have been replaced by other supports or services." N.H. Admin. R., He-M 503.15(a)-(b); see N.H. Admin. R., He-M 503.02(an) (defining "termination" as "the cessation of a service by an area agency director with or without the informed consent of the [disabled] individual" or his guardian/representative).

### D.  The Parties' Arguments

It is undisputed that Worksource failed to comply with the notice requirements set forth in RSA 171-A:8, III and Rule 310.07 when it sought to cease providing services to the petitioner.  What is disputed is whether Worksource had to comply with those requirements to begin with.[2]  According to the parties, their dispute turns upon whether Worksource "terminated" services to the petitioner.  MDS, Worksource, and the Bureau argue that a developmentally disabled individual is entitled to prior notice and the opportunity to file an appeal only when an area agency terminates services to an individual and that the cessation of services to an individual by a provider agency is not a "termination."  They contend that although Worksource ceased to provide services to the petitioner, it lacked the authority to "terminate" services to him; that authority resides solely with the area agency.

The petitioner counters that the statutory and regulatory scheme allows a "provider agency," such as Worksource, to "terminate" services to an individual and that this action entitles the disabled individual to prior notice and the opportunity to file an appeal.  For the purposes of this appeal, we assume without deciding that the petitioner is correct that a provider agency, such as Worksource, may terminate services to an individual and that when this occurs, the individual is entitled to notice and an opportunity to appeal. We conclude, however, that what occurred in this case was not a "termination" of services.

As the Bureau asserts, "the conditions under which a service may be terminated," pursuant to RSA 171-A:8, I, and Rule 310.07, "only make sense if 'termination' is interpreted as the individual no longer receiving the service, not simply being transitioned to a different service provider."  Pursuant to both RSA 171-A:8, I, and Rule 310.07 a "termination" of services may occur when it is in the disabled person's best interest or the disabled person is able to function independently without the service or has received optimal benefit from the service.  See RSA 171-A:8, I; N.H. Admin. R., He-M 310.07.  Rule 310.07 also allows services to be terminated when the disabled person refuses to pay

---

[2] Worksource observes that the notice it provided in this case complied with its Master Agreement with MDS.  We need not decide in this appeal whether Worksource is correct.

8

for them or refuses to apply for benefits that could cover their cost.  <u>N.H. Admin. R.</u>, He-M 310.07.

Thus, in the instant matter, a "termination" would have occurred if Worksource, which provided day services to the petitioner, ceased providing them because day services — from any provider — were no longer in his best interest, were no longer necessary because he could function independently without them or had received the optimal benefit from them, or because they could no longer be provided given his unwillingness to pay for them or to apply for benefits that could cover their cost.  <u>See</u> RSA 171-A:8, I; <u>N.H. Admin. R.</u>, He-M 310.07.  However, that is not what occurred here.  Worksource did not cease providing day services to the petitioner because he no longer needs or should not otherwise be provided with them.  Rather, Worksource stopped providing day services to the petitioner because it believes that he would be better served by another provider agency; in other words, because Worksource no longer desires to provide such services to the petitioner.  As the Bureau correctly observes, neither the relevant statutes nor the applicable administrative rules preclude a provider agency from declining to serve a particular individual or entitle that individual to receive services from a provider that is unwilling to provide them.  Accordingly, because Worksource did not "terminate" day services to the petitioner, within the meaning of the applicable statutes and regulations, it need not have complied with the notice requirements of RSA 171-A:8, III and Rule 310.07.

<u>Affirmed</u>.

LYNN, C.J., and BASSETT, HANTZ MARCONI, and DONOVAN, JJ., concurred.

9