NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by email at the following address: reporter@courts.state.nh.us.  Opinions are available on the Internet by 9:00 a.m. on the morning of their release.  The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Department of Health and Human Services
Case No. 2023-0488
Citation: Petition of Mason, 2024 N.H. 67


PETITION OF JACOB SOLOMON MASON & a.
(New Hampshire Department of Health and Human Services)

Argued: June 27, 2024
Opinion Issued: December 19 , 2024

Wadleigh, Starr & Peters, PLLC, of Manchester (Dean B. Eggert and Elizabeth E. Ewing on the briefs, and Dean B. Eggert orally), Eckert Seamans Cherin & Mellott, LLC, of Boston, Massachusetts (Michael P. Flammia and Christian B.W. Stephens on the briefs), and Nicholson Law Firm, of Concord (Tracy M. Culberson on the briefs), for the petitioners.

McLane Middleton, Professional Association, of Manchester (Michael A. Delaney and Rebecca S. Walkley on the briefs), for The Moore Center, Inc., and Lakes Region Community Services.

John M. Formella, attorney general, and Anthony J. Galdieri, solicitor general (Laura E. B. Lombardi, senior assistant attorney general, on the initial brief and orally, and Mary A. Triick, senior assistant attorney general, on the

supplemental brief), for the New Hampshire Department of Health and Human Services, Bureau of Developmental Services.

DONOVAN, J.

[¶1] The petitioners, Jacob Solomon Mason, Matthew Halle, Tyler Jerome, Daevon Soto, and Timothy Douglas McDonald, and their guardians, Kayode Mason, Cheryl Hoitt, Tammy Jerome, Richard Jerome, Venus Barreto, and the Office of Public Guardian, both in their individual capacities and as guardians, who are joined by Lakes Region Community Services and The Moore Center, Inc. (area agencies), seek review by way of a petition for a writ of certiorari of a decision of the Commissioner of the New Hampshire Department of Health and Human Services (Commissioner).[1]  The Commissioner granted summary judgment to respondent Department of Health and Human Services, Bureau of Developmental Services (BDS), ruling that BDS did not terminate the petitioners' services provided under RSA chapter 171-A (2022 & Supp. 2023) and that all petitioners were therefore not entitled to an administrative appeal. All petitioners argue that the Commissioner erred in ruling that: (1) BDS cannot use state funds to pay for services that do not comport with the federal Settings Rule, 42 C.F.R. § 441.301 (2023); and (2) services were not terminated and, therefore, they were not entitled to an appeal.  All petitioners also argue that the Commissioner violated their due process rights throughout the course of the administrative proceedings.  We conclude that all petitioners had a right to appeal pursuant to New Hampshire Administrative Rule, He-M 503.07 (effective July 25, 2015; amended December 29, 2023) (Rule 503.07), but that RSA chapter 171-A prohibits BDS from using state funds to pay for services that do not comport with the federal Settings Rule.  Accordingly, we affirm.

I.  Facts

[¶2] The following facts are agreed upon by the parties or are otherwise supported by the record.  The petitioners are five severely developmentally disabled men with behavioral disorders who require intensive care in a residential treatment setting and receive services through New Hampshire's developmental services system.  See RSA 171-A:1 (2022), :4 (2022).  The two area agencies administer services for each petitioner.  See RSA 171-A:2, I-b (2022) (defining "area agency"), :18 (2022) (setting forth responsibilities and operations of area agencies).  As of 2019, the petitioners were receiving services from the Judge Rotenberg Educational Center, Inc. (JRC), a residential

---

[1] There are eleven petitioners, including five men with developmental disabilities and their six guardians.  We refer to the five individuals as "the petitioners" and to their guardians as "guardian petitioners."  We refer to the collective group of eleven petitioners as "all petitioners."  The area agencies, Lakes Region Community Services and The Moore Center, Inc., are co-respondents and were named as parties in the underlying administrative appeal.  The area agencies, however, agree with all petitioners and join their petition for a writ of certiorari.

treatment and education program in Massachusetts that specializes in providing intensive treatment and ancillary services for people with severe behavioral disorders. The petitioners received federal Medicaid home and community-based services (HCBS) waiver funding, also referred to as section 1915(c) waiver funding, for services provided by JRC. See Social Security Act § 1915(c), 42 U.S.C. § 1396n(c) (2024).

[¶3] The HCBS waiver program "enables States to receive Federal funding for community-based services provided to individuals who would otherwise be institutionalized." Judge Rotenberg Educ v. Dept. of Dev. Serv., 215 N.E.3d 1119, 1148 n.29 (Mass. 2023); see also 42 U.S.C. § 1396n(c)(1). In New Hampshire, the Department of Health and Human Services (DHHS) administers HCBS waiver funding, which includes the developmental disabilities waiver that it administers through BDS. In 2014, the federal Centers for Medicare and Medicaid Services (CMS) promulgated the Settings Rule, codified in 42 C.F.R. § 441.301. See 42 C.F.R. § 441.301(c). As relevant to this case, the Settings Rule mandates that HCBS be provided in home and community-based settings, and it enumerates the qualities required of those settings. See 42 C.F.R. § 441.301(c)(4)-(5). CMS gave New Hampshire and other states until March 17, 2023, to comply with the new Settings Rule requirements.

[¶4] In early 2022, CMS informed BDS that JRC is not an approved HCBS provider and that effective January 12, 2022, BDS could no longer use federal HCBS waiver funding to pay for the petitioners' services at JRC. BDS informed the area agencies of CMS's determination and committed to funding the petitioners' services at JRC using state general funds through June 30, 2022, which BDS later extended to September 2, 2022. BDS informed the area agencies that prior to September 2, they must have either "identified a model of service delivery with an approved 1915 (c) waiver provider" or "identified and committed to an alternative funding source." BDS further advised that if an individual "remains at the JRC after September 2, 2022, your agency will be responsible for funding the placement." The area agencies informed JRC in March 2022 that, because federal funding could no longer be used to pay for services at JRC, they would terminate their contract with JRC effective June 30. It appears, however, that JRC continued to provide services without a contract as of July 1.

[¶5] In July 2022, the area agencies sent letters to the guardian petitioners informing them that BDS would cease funding the petitioners' services at JRC after September 2. The area agencies explained that they had neither identified an appropriate provider that was ready, willing, and able to provide services to the petitioners, nor identified an alternative funding source for services at JRC that would replace the federal funds that became unavailable in January 2022 and the state funds that would be unavailable after September 2. Without funding to pay for services at JRC, and with no

alternative service provider identified, the area agencies explained that "there could be a <u>termination of [the petitioners'] specialized services</u>."

[¶6] The letters also notified the guardian petitioners of their right to appeal pursuant to New Hampshire Administrative Rules, He-M 310.07 (effective April 25, 2015; amended June 24, 2023) and He-M 503.17 (effective July 25, 2015; amended December 29, 2023) (respectively, Rule 310.07 and Rule 503.17).[2] The letters explained that the guardian petitioners were "entitled to notice of your right to appeal a decision, determination, or action that could terminate [the petitioners'] specialized services or adversely impact your ability to protect [the petitioners'] right to appropriate, needed services under RSA chapter 171-A and the administrative rules enacted pursuant to the statute." The agencies also suggested that pursuant to Rules 310.07 and 503.17(g), the petitioners "may have a continuing right to services, and payment for those services, pending a decision on your appeal."

[¶7] In response to these communications, all petitioners appealed BDS's decision to terminate state funding to the DHHS Administrative Appeals Unit (AAU), claiming that termination of funding without an alternative, appropriate placement amounted to a termination of their RSA chapter 171-A developmental disability services. All petitioners also requested that the area agencies and BDS be compelled to continue to fund the petitioners' placement at JRC during the appeal. In August 2022, the area agencies filed emergency motions, which all petitioners subsequently joined, requesting that the AAU, on or before September 2, issue a protective order requiring BDS to continue to fund the petitioners' services at JRC during the pendency of the appeals.

[¶8] On October 5, following a pre-hearing conference, the Commissioner issued a decision on the emergency motions.[3] The Commissioner began by

_____

[2] The parties agree that the administrative rules in effect in 2022 apply to the case at hand. Accordingly, we apply the administrative rules as they existed in 2022.

[3] The Department of Health and Human Services (DHHS) is under the direction of a commissioner of health and human services (Commissioner). RSA 126-A:5, I (2021). The Commissioner establishes the appeals process for matters within the jurisdiction of DHHS. RSA 126-A:5, VIII (2021). The Administrative Appeals Unit (AAU) is the unit within DHHS "that receives appeal requests, schedules proceedings, conducts prehearing conferences and hearings and issues decisions for [DHHS]." <u>N.H. Admin. R.</u>, He-C 201.02(a) (effective April 13, 2007). For most appeals, "the commissioner, or a hearings examiner designated by the commissioner, shall conduct an administrative hearing in accordance with the rules established by the commissioner." RSA 126-A:5, VIII(b); <u>see also</u> <u>N.H. Admin. R.</u>, He-C 201.05(a) (effective April 13, 2007) ("All hearings and independent reviews shall be conducted by a presiding officer appointed by the commissioner to implement the appeals process under RSA 126-A:5, VIII."). "Unless the commissioner has delegated to the hearings examiner authority to issue a decision on behalf of [DHHS], following the hearing, the hearings examiner shall submit to the commissioner a proposed decision . . . ." RSA 126-A:5, VIII(c); <u>see also</u> <u>N.H. Admin. R.</u>, He-C 201.05(b) ("Presiding officers shall make final decisions on behalf of the commissioner in any administrative appeal

4

observing that the parties agreed that JRC is ineligible to receive HCBS waiver funding, that the petitioners are severely developmentally disabled and eligible for waiver services, and that DHHS has a statutory obligation to provide services to the petitioners. The Commissioner noted that the parties disagreed, however, as to whether a termination of funding and/or services occurred and whether BDS was obligated to continue to provide funding during the pendency of the appeals.

[¶9] BDS argued that its decision to cease using state general funds to pay for the petitioners' services at JRC was not a termination, and, therefore, it did not have an obligation to continue funding during the pendency of the appeals. All petitioners countered that BDS has a statutory obligation to provide the petitioners with services and that Rules 310.07 and 503.17 authorized the continuation of services and payments during the appeals. The Commissioner found that BDS's arguments were "less persuasive" and ruled that "[a]lthough it is premature at this point to make a decision as to whether a termination has occurred, there is nonetheless support for [all petitioners' and area agencies'] position that benefits must continue pending appeal." Accordingly, the Commissioner granted the area agencies' emergency motions and ordered BDS to continue to fund the petitioners' services at JRC during the administrative appeals.

[¶10] In February 2023, BDS filed a motion seeking: (1) an order dismissing each appeal as of March 17, 2023; and (2) an order in each appeal declaring that "if the Area Agency continues to administer programs and services through contract with the [JRC to the petitioners] as of or after March 17, 2023, this will be a violation of RSA 171-A and BDS cannot be compelled to fund the cost of such services." BDS argued that RSA chapter 171-A, specifically RSA 171-A:1-a, II (2022) and RSA 171-A:18, II, requires any program or service that BDS and the area agencies provide — whether state or federally funded — to comply with the federal Settings Rule. Given CMS's mandate that New Hampshire and other states must comply with the Settings Rule as of March 17, 2023, BDS argued that all programs and services provided pursuant to RSA chapter 171-A must also comply by that date. Because JRC would not be in compliance with the Settings Rule by March 17, BDS argued that it could not be compelled to fund the services and programs that JRC provided to the petitioners — regardless of the source of funding — as doing so would violate RSA chapter 171-A. All petitioners and the area agencies objected.

[¶11] The AAU held a status conference on March 8, during which the two presiding hearing officers heard arguments on BDS's motion. The hearing

_____

under RSA 126-A:5, VIII, unless the commissioner orders otherwise in a particular matter."). The Commissioner ultimately issues a final decision on the appeal. RSA 126-A:5, VIII(e); see also N.H. Admin. R., He-C 201.05(b); N.H. Admin. R., He-C 203.22(f) (effective April 13, 2007).

officers provided the Commissioner with a written proposed order on March 10, although this proposed order was not shared with all petitioners. On March 17, BDS ceased funding the petitioners' services at JRC, explaining that continuing to fund an unqualified provider after March 17, 2023, would violate RSA 171-A:18.

[¶12] On March 28, the Commissioner issued a proposed decision on BDS's motion. The Commissioner construed BDS's motion for declaratory order and dismissal as a motion for summary judgment. The Commissioner identified the two issues that the motion presented: (1) "whether the act of not funding services to an unqualified institution is considered a termination of services"; and (2) "whether BDS can be compelled to fund the cost of services to an unqualified institution."

[¶13] The Commissioner began by addressing the second issue, finding that the deadline for compliance with the federal Settings Rule was March 17, 2023, and that CMS had deemed JRC to be an unqualified institution. The Commissioner adopted BDS's interpretation of RSA chapter 171-A, ruling that "Federal law placed limits on available Medicaid funding for services and the [New Hampshire] legislature agreed by incorporating 42 C.F.R. § 441.301 into State law." As a result, the Commissioner determined that "BDS cannot be compelled to pay for services that do not comply with the settings rule."

[¶14] Regarding the first issue, the Commissioner ruled that "CMS, through BDS, is not reducing or terminating the [petitioners'] financial assistance but merely requiring the [petitioners] to use the assistance for care in a qualified facility." The Commissioner concluded that there was no termination of benefits and, accordingly, that all petitioners were not entitled to an appeal. Ultimately, the Commissioner granted summary judgment to BDS.

[¶15] All petitioners and the area agencies filed a request for briefing and oral argument regarding the March 28 proposed decision, and requested access to the hearing officers' proposed written decision following the March 8 hearing. The Commissioner granted the request for briefing and oral argument but denied the request for the hearing officers' proposed decision. After considering the parties' written and oral arguments, the Commissioner issued a final decision on July 26, 2023 adopting the March 28 proposed decision. All petitioners moved for reconsideration, to which BDS objected.

[¶16] In August 2023, all petitioners filed in this court a petition for a writ of certiorari and a motion requesting that this court stay the July 2023 final decision, order BDS to fund the petitioners' services at JRC during the pendency of this petition in accordance with the October 5, 2022 funding order, and order BDS to reimburse JRC and the area agencies for payments withheld in violation of the October 5 order. We accepted the petition, granted the motion to stay, and ordered DHHS to continue funding the petitioners'

6

services at JRC pending the outcome of this proceeding and to reimburse JRC and the area agencies for payments withheld during the administrative proceedings. By this time, only two petitioners, Jacob Solomon Mason and Tyler Jerome, remained at JRC, as the other three petitioners had transitioned to other qualified providers. Following oral argument, the parties filed supplemental briefs addressing: (1) whether the State, for purposes of using state funding, is bound by the CMS finding that JRC is not a qualified HCBS provider pursuant to the Settings Rule; and (2) whether the Settings Rule prohibits use of state funds to pay for services provided by JRC.

## II. Analysis

[¶17] A petition for a writ of certiorari is the only mechanism for review of a fair hearings decision issued by the AAU. Petition of Guillemette, 171 N.H. 565, 568 (2018). Review on certiorari is an extraordinary remedy, usually available only in the absence of a right to appeal, and only at the discretion of the court. Id. Our review of an AAU decision on a petition for a writ of certiorari entails an examination of whether the AAU acted illegally with respect to jurisdiction, authority, or observance of the law or has unsustainably exercised its discretion or acted arbitrarily, unreasonably, or capriciously. Id. We exercise our power to grant such writs sparingly and only when to do otherwise would result in substantial injustice. Id.

[¶18] Because this proceeding arises from a motion deemed to be for summary judgment, we consider the evidence, and inferences properly drawn therefrom, in the light most favorable to the non-moving parties, here all petitioners. See Sabinson v. Trustees of Dartmouth College, 160 N.H. 452, 455 (2010). If this review does not reveal any genuine issues of material fact, and if the moving party is entitled to judgment as a matter of law, we will affirm. Id. We review the fact finder's application of the law to the facts de novo. Id.

[¶19] As a threshold matter, we must first determine whether all petitioners had a right to appeal to the AAU. See RSA 171-A:8 (2022); N.H. Admin. R., He-M 310.07; N.H. Admin. R., He-M 503.07. All petitioners argue that "[a]ppealable terminations occurred when JRC's service contract was terminated and when funding for [the] Petitioners' services at JRC ceased" because "[e]ach time, no alternative appropriate provider was ready or able to assume [the] Petitioners' care." All petitioners contend that Rules 310.07 and 503.07 "support these conclusions." BDS disagrees, arguing that there has been no termination of services pursuant to RSA 171-A:8 and that Rules 310.07 and 503.07 are inapplicable to the facts of this case.

[¶20] To resolve this issue, we must interpret the statutes and regulations governing services to individuals with developmental disabilities. We review the AAU's statutory and regulatory interpretation de novo. Petition of Guillemette, 171 N.H. at 568. We use the same principles of construction

7

when interpreting both statutes and regulations.  Id.  Thus, in construing rules, as in construing statutes, when possible, we ascribe the plain and ordinary meaning to the words used.  Id.  We interpret the statute or rule as written and will not consider what the legislature or administrative agency might have said or add language that the legislature or administrative agency did not see fit to include.  See id.  We construe all parts of a statute or regulation together to effectuate their overall purposes and avoid absurd or unjust results.  Id. at 568-69.  Thus, we assess the regulatory or statutory scheme as a whole, and we do not consider words and phrases in isolation, but rather within the context of the statute or regulation as a whole.  Id. at 569.  When the language of a statute or regulation is plain and unambiguous, we need not look beyond the statute or regulation itself.  Id.

[¶21]  We begin by reviewing the statutory and regulatory framework governing the provision of services to individuals with developmental disabilities, such as the petitioners.  See RSA ch. 171-A.  DHHS is responsible for maintaining, coordinating, and supervising the state's developmental disabilities services delivery system pursuant to RSA chapter 171-A.  Petition of Guillemette, 171 N.H. at 569; RSA 171-A:1, :4.  The Commissioner of DHHS is tasked with adopting rules to implement RSA chapter 171-A.  RSA 171-A:3 (2022).

[¶22]  The state service delivery system comprises "a comprehensive array of services for the diagnosis, evaluation, habilitation and rehabilitation of developmentally disabled persons, including but not limited to, service coordination, community living arrangements, employment and day services," and family supports.  RSA 171-A:2, XVI (2022).  Area agencies may use funds dispensed by DHHS to establish, operate, or administer programs and services for persons with developmental disabilities and may enter into contracts with individuals or organizations to provide those programs or services.  Petition of Guillemette, 171 N.H. at 570; see RSA 171-A:19, I, II (2022).  Thus, "in addition to the basic developmental services provided by regional area agencies, individuals may also receive developmental services through a variety of other programs or institutions."  Petition of Guillemette, 171 N.H. at 570 (quotation and brackets omitted).

[¶23]  "An individual, guardian, or representative may select any person, any provider agency, or another area agency as a provider to deliver one or more of the services identified in the individual's service agreement."  N.H. Admin. R., He-M 503.07(d).  The providers must "comply with the rules pertaining to the service(s) offered and meet the provisions specified within the individual's service agreement."  Id.  They must also "enter into a contractual agreement with the area agency and operate within the limits of funding authorized by it."  Id.

[¶24] In certain circumstances, an area agency is obligated to refuse to enter into a service contract with a provider or must terminate a service contract with a provider that was chosen by the individual, guardian, or representative. N.H. Admin. R., He-M 503.07(e), (f). An area agency must refuse to enter into a service contract with a provider chosen by the individual, guardian, or representative if the provider "proposes a service arrangement which is not in accordance with department rules, or is a provider that has not been in compliance with department rules in the past." N.H. Admin. R., He-M 503.07(e) (emphasis added). Similarly, an area agency must terminate an existing contract with a provider chosen by the individual, guardian, or representative if the area agency determines that the provider is "not implementing the service agreement, providing for the health and safety of the individual, or in compliance with applicable rules while providing services." N.H. Admin. R., He-M 503.07(f) (emphasis added). The individual, guardian, or representative may appeal the area agency's decision under Rule 503.07(e) or (f). N.H. Admin R., He-M 503.07(h).

[¶25] Here, the area agencies terminated and did not renew their contracts with JRC after BDS announced that it would discontinue funding the petitioners' services at JRC given CMS's decision that JRC did not comply with the federal Settings Rule. Consequently, JRC's provider contracts expired on June 30, 2022. At the time, BDS did not further explain its discontinuance of funding for the petitioners' services at JRC beyond stating that it could no longer use federal funding and that there was neither unlimited state funding nor an affirmative obligation to pay for services at JRC. BDS later asserted, however, that it could not use state funds for the petitioners' services at JRC because RSA 171-A:2, I-b and RSA 171-A:18, II prohibit DHHS from using either state or federal funds for providers that are not in compliance with the Settings Rule.

[¶26] It is well established that "administrative officials do not possess the power to contravene a statute." Petition of Strandell, 132 N.H. 110, 119 (1989) (quotation omitted). "Administrative rules may not add to, detract from, or modify the statute which they are intended to implement." Id. BDS's allegation that its use of state or federal funds for services at JRC would violate RSA 171-A:2, I-b and RSA 171-A:18, II because JRC is not in compliance with the Settings Rule is, essentially, an allegation that JRC is not "in compliance with applicable rules while providing services." N.H. Admin. R., He-M 503.07(f); see RSA 171-A:3 (directing the Commissioner to adopt rules to implement RSA chapter 171-A); RSA 171-A:18, IV (directing the Commissioner to "adopt rules establishing standards for the provision of services by area agencies and authorized agencies to developmentally disabled persons"). Accordingly, given BDS's subsequent explanation for why it could not use state or federal funds for JRC's services, we construe the area agencies' decision to terminate and not renew their contracts with JRC, which was predicated upon BDS's decision to cease funding, as a decision grounded in JRC's alleged

9

failure to be "in compliance with applicable rules while providing services." N.H. Admin. R., He-M 503.07(f). As a result, all petitioners were entitled to appeal the area agencies' termination and non-renewal of their contracts with JRC pursuant to Rule 503.07(h).

[¶27] Given this conclusion, we next consider whether the termination and non-renewal was lawful. See N.H. Admin. R., He-M 503.07(f) (setting forth the reasons that an area agency may terminate a contract with an existing provider). To resolve this issue, we must determine whether RSA chapter 171-A, specifically RSA 171-A:2, I-b and RSA 171-A:18, II, prohibits DHHS from allocating state funds for services provided by a provider that does not comply with the Settings Rule. See id. (termination of a contract is lawful if the provider is not "in compliance with applicable rules while providing services").

[¶28] BDS argued during the administrative proceedings and maintains here that RSA 171-A:2, I-b and RSA 171-A:18, II preclude DHHS from using state funds to pay for services from a provider that does not conform with the federal Settings Rule. BDS relies upon language in both provisions stating that RSA chapter 171-A services for persons with developmental disabilities must be provided or administered "in accordance with 42 C.F.R. section 441.301." RSA 171-A:2, I-b, :18, II. In its supplemental brief, BDS asserts that "[t]he New Hampshire legislature [chose] to bind BDS to the [Settings Rule] requirements" by incorporating 42 C.F.R. § 441.301 into RSA 171-A:18, II.

[¶29] In contrast, all petitioners and the area agencies contend that CMS's "determination that JRC is not a qualified HCBS setting . . . does not bind the State from using state funds to ensure the health, safety, and welfare of its citizens." They argue that RSA 171-A:2, I-b and RSA 171-A:18, II do not prohibit DHHS from using state funds to pay for the petitioners' services, even if JRC is not compliant with the Settings Rule. All petitioners and the area agencies assert that "the State may plainly still fund services using state funds even if federal Medicaid funding is unavailable." We disagree.

[¶30] RSA 171-A:18, II provides, in relevant part, that "[a]rea agencies, authorized agencies, and other organizations under contract to provide services in accordance with this chapter shall administer programs and services in accordance with 42 C.F.R. section 441.301, and any subsequent amendments thereto." (Emphasis added.) RSA 171-A:2, I-b defines "Area agency" as "an entity established as a nonprofit corporation in the state of New Hampshire which is established by rules adopted by the commissioner to provide or coordinate services to developmentally disabled persons in the area in accordance with 42 C.F.R. section 441.301." (Emphasis added.) The Settings Rule enumerates the qualities that a home and community-based setting must possess in order for a state to use federal funding to cover the cost of services at this setting. See 42 C.F.R. § 441.301(c)(4).

10

[¶31] As we have previously explained, the plain meaning of "in accordance with" is "in agreement or harmony with; in conformity to." Krainewood Shores Ass'n v. Town of Moultonborough, 174 N.H. 103, 108 (2021) (interpreting language of RSA 677:15, I (2016)); see also Oxford English Dictionary, https://www.oed.com/dictionary/accordance_n?tab=meaning_and_use#37376 661 (last visited Dec. 9, 2024) (defining "in accordance with" as "in agreement or harmony with; in conformity to; according to"). Thus, RSA 171-A:2, I-b and RSA 171-A:18, II instruct area agencies and other entities to provide, coordinate, or administer RSA chapter 171-A services "in agreement or harmony with" or "in conformity" with the Settings Rule. See Krainewood Shores Ass'n, 174 N.H. at 107-08. While the use of state funds for services that are not in harmony or conformity with the Settings Rule would not violate the Settings Rule itself, such use of state funds would violate RSA chapter 171-A. The legislature's explicit incorporation of the requirements set forth in 42 C.F.R. § 441.301 into RSA chapter 171-A prohibits DHHS from using state funds for services that do not comply with the federal regulation.

[¶32] Other principles of statutory construction support our conclusion. For example, we have relied on legislative preambles and purpose clauses as indicators of the meaning of a statute. See, e.g., In re Guardianship of C.R., 174 N.H. 804, 811 (2012). Here, the language in RSA 171-A:2, I-b and RSA 171-A:18, II requiring compliance with the Settings Rule was added to RSA chapter 171-A in 2019. See Laws 2019, ch. 287. One of the stated purposes for adding this language was to require "services provided to individuals with disabilities by area agencies and authorized agencies to comply with RSA 171-A and the federal requirements for home and community based care waiver." Id. (Emphasis added.) Furthermore, the 2019 amendment added the same requirement of compliance with 42 C.F.R. § 441.301 to RSA chapter 151-E, which pertains to care for Medicaid-eligible elderly and chronically ill adults. Id.; see also RSA 151-E:1, :4, II (2021) ("All individuals, entities, or organizations under contract to provide services in accordance with this chapter shall administer programs and services in accordance with 42 C.F.R. section 441.301, and any subsequent amendments thereto.").

[¶33] Nonetheless, all petitioners and the area agencies claim that interpreting RSA chapter 171-A as prohibiting the use of state funds for services provided by JRC is "at odds with not only the best interests of New Hampshire's citizens but also the fundamental federalism principles . . . by which the federal government cannot limit a state's ability to use state funds to pay for an individual's services at a legally operated facility such as JRC." (Quotation omitted.) However, there is no dispute that the Settings Rule applies only to federal funding and does not, by its own terms, preclude states from using state funding for services that do not comply with the federal rule. See 42 C.F.R. § 441.300 (2023); 42 C.F.R. § 441.301(c)(4); 42 U.S.C. § 1396n(c). Thus, federalism concerns are not relevant here, and our

11

interpretation relies upon the language used in RSA chapter 171-A. It is the legislature's explicit incorporation of the Settings Rule into New Hampshire law that prohibits "[a]rea agencies, authorized agencies, and other organizations under contract to provide services in accordance with" RSA chapter 171-A from administering programs and services that are not "in accordance with 42 C.F.R. section 441.301." RSA 171-A:18, II.

[¶34] As BDS observes, New Hampshire is "free to set its own standards for purposes of expending its own funds." Nevertheless, it chose to incorporate the federal standard into state law, which "maximize[s] the use of federal funding for the benefit of New Hampshire's citizens." Therefore, RSA chapter 171-A's mandate that services be administered "in accordance with 42 C.F.R. section 441.301" prohibits BDS from using state funds for services provided by JRC. See RSA 171-A:2, I-b, :18, II. Of course, if the legislature disagrees with our interpretation, it is free to amend the statutory scheme as it sees fit within constitutional bounds. Doe v. Comm'r, N.H. Dep't of Health & Human Servs., 174 N.H. 239, 261 (2021).

[¶35] Finally, all petitioners assert that "New Hampshire law precludes DHHS from abandoning [the petitioners] and requires their humane treatment." We recognize that DHHS is responsible for providing appropriate services to individuals with developmental disabilities. See RSA 171-A:1 (enabling DHHS to "establish, maintain, implement, and coordinate a comprehensive service delivery system for developmentally disabled persons"); RSA 171-A:4 ("[DHHS] shall maintain a state service delivery system for the care, habilitation, rehabilitation, treatment and training of developmentally disabled persons."); see also RSA 171-A:13 (2022) ("Every developmentally disabled client has a right to adequate and humane habilitation and treatment . . . ."). The broad statutory purpose of RSA chapter 171-A, however, does not override the specific language chosen by the legislature that prohibits the use of state funds for services that do not comply with the Settings Rule. See Appeal of Town of Lincoln, 172 N.H. 244, 251 (2019).

## III. Conclusion

[¶36] In sum, we conclude that all petitioners had a right to appeal the area agencies' decisions to terminate and not renew their service contracts with JRC. See N.H. Admin. R., He-M 503.07(f), (h). However, RSA chapter 171-A prohibits DHHS from using state funds for providers that are not in compliance with the Settings Rule. Therefore, we affirm the Commissioner's decision granting summary judgment to BDS. Given this conclusion, we need not address all petitioners' remaining arguments.

Affirmed.

MACDONALD, C.J., and BASSETT and COUNTWAY, JJ., concurred.

12